LOTTINGER, Judge.
This is an action ex delicto filed by Peggy Parish, petitioner, against Robert Taylor Sevalia, the driver of a truck, Rolen R. Clement, owner of the truck and Sevalia’s employer and Liberty Universal Insurance Company, and liability insurer of the truck. Following trial below, the Lower Court rendered judgment in favor of petitioner and against all three defendants in solido. The defendants have appealed. Plaintiff *385 has answered the appeal seeking- an increase in quantum.
For purposes of trial below, this case was consolidated with the suit entitled Donna Sue Fanguy v. Liberty Universal Insurance Company et al., Number 8324 on the Docket of this Court, 251 So.2d 388. In said companion case, judgment was also rendered by the Lower Court in favor of petitioner and against all three defendants in solido. We will treat both cases in this opinion, however, separate judgments will be rendered.
The findings of fact by the Lower Court as to the occurrence of the collision are as follows:
“Briefly, the facts elicited on the trial of these cases reflect that Mrs. Fanguy was driving in a southerly or downriver direction accompanied by two passengers, Robert Bruno and Peggy Parish, who were sharing the right front seat of the Volkswagen. Upon coming abreast of the Rhythm Club, which is situated on the opposite side of the road from the levee, the Volkswagen struck a GMC stake-body truck which was blocking a portion of the southbound lane of traffic. This was the truck owned by Rolen R. Clement and driven to the location by Robert Taylor Sevalia. Thereafter the Volkswagen veered into the northbound lane and collided with a Ford driven by Jeffery Marshall who was driving in an upriver direction. It appears that the rear wheels of the GMC truck were stuck in a ditch paralleling the levee side of the road and had become so lodged when Sevalia had attempted to back the truck into a parking area along that side of the road. Sevalia apparently made some attempt to extricate the vehicle but without success and he thereafter repaired to the confines of the Rhythm Club. He acknowledged he had not put out any flares or warning devices in the vicinity and knew nothing of any one acting as a flagman. The Court is satisfied that there was no compliance by the driver with the provisions of LSA-RS 32:141 (c) and that his failure in this regard was the proximate cause of the accident.
The principal defendants submit, however, that the driver of the Volkswagen was contributorily negligent in a number of respects and this should bar her recovery. Particularly they contend Mrs. Fanguy was driving too fast under conditions and failed to keep a proper lookout.
As to the first contention, the Court finds the testimony of the witnesses shows Mrs. Fanguy was not driving at an excessive rate of speed. Both Jeffery Marshall and Philip Krumholt who were in approaching and following vehicles, respectively, testified that Mrs. Fanguy was driving at a moderate rate of speed. Krumholt estimated her speed at thirty-five miles an hour and in this area the Court does not believe such speed to be excessive.
There were several factors which affected Mrs. Fanguy’s vision insofar as signaling the presence of the truck in her traffic lane. The most important factor impairing her vision was the glare from the headlights of Marshall’s vehicle approaching in the opposite lane. In addition, there were no lights of any description on the levee side of the road where the truck was situated which created a substantial contrast to the lighting present on the other side. Despite the introduction of several photographs (Liberty Universal-3) taken at night which tend to emphasize the lights affecting the area, the testimony of the investigating trooper and Krumholt reflect that the pictures magnify the actual intensity of the light prevailing at the time. Finally, the Court believes the lights of the truck were not illuminated at the time of the accident and this, combined with the dark color of the truck, obscured its outlines. Further evidence conclusive of the overall picture presented, is Marshall’s statement that he did not see the truck either prior to the collision. With this abundant evi *386 dence, the Court is satisfied Donna Sue Fanguy was not contributorily negligent.”
While the defendants submit that the defendant, Taylor, was negligent in leaving his unattended truck parked with its rear end in the ditch and its front end extending some three quarters across the southbound lane of traffic, they maintain on this appeal that Mrs. Fanguy was guilty of contributory negligence which was a proximate ' cause of the accident, thus barring her recovery herein. As regards Miss Parish, the defendants maintain that recovery by her is also barred under the doctrine of assumption of risk.
The contributory negligence on the part of Mrs. Fanguy as claimed by the defendants consist of her failure to keep a proper lookout and to see what she should have seen. This contention on the part of the defendants is based on the testimony of Mrs. Fanguy and her passengers to the effect that, immediately prior to the collision with the truck, she did not recall seeing any oncoming traffic on the highway nor does she recall being blinded by the lights of the approaching Ford automobile. Her testimony in this regard was:
“Well, it has been stated that there was an oncoming car so whether I was blinded or not I don’t recall. I don’t recall an oncoming car.”
The testimony of Mrs. Fanguy was to the effect that she first noticed the stalled truck at a distance of some 20 feet at which time she immediately attempted to apply her brake, however, she did not have time for the brakes to catch prior to the impact. Thus, no skid marks were left by the Fan-guy vehicle.
The testimony of Trooper Aubert, the Louisiana State Patrolman who investigated this accident, was to the effect that there was some five to ten vehicles parked on the shoulder in the immediate vicinity on the levee side of the highway and on the Baton Rouge side of the stalled truck. Thus, as Mrs. Fanguy approached the site of the impact, she was required to pass these five to ten parked cars before reaching the point of the parked truck, during which time the oncoming vehicle driven by Mr. Jeffery Marshall was approaching.
The nearness of the Marshall vehicle to the scene of the impact between the Fanguy vehicle and the stalled truck is shown by the testimony of Marshall himself who stated that he first noticed the lights of an oncoming vehicle (theVolkswagen). Suddenly, the lights disappeared from his view, then suddenly the lights reappeared and he was struck by the Volkswagen driven by Mrs. Fanguy. The scene of the impact between the Fanguy and Marshall vehicles was some one car length south of the stalled truck.
Mr. Marshall testified that he did not see the stalled truck in the highway until he was struck by the Fanguy vehicle. Thus, we have the testimony of the three parties who were in the plaintiff’s vehicle who testified that they could not see the stalled truck until just prior to the impact, along with the testimony of Mr. Marshall who testified that he was unable to see the lighted truck in the highway until he was hit by the Volkswagen automobile.
The testimony of W. H. Tonn, Jr., who was introduced by petitioner as an expert in the field of the effects of nighttime lighting and its effects on drivers, was to the effect that the lights of the approaching vehicle would interfere with the vision of the driver of the Volkswagen. He testified to the fact that there were several automobiles parked on the shoulder of the highway between the stalled truck and the oncoming Volkswagen would tend to create a more confused situation to the oncoming driver. He stated that the presence of the other parked vehicles would tend to blend in with the truck and reduce the visibility of the truck particularly in regard to where it was sitting with its back end in the ditch. He further testified that the illumination which would come from the lights which they did have on the opposite side of the roadway would give some illumination, but the illumination that they would give would be overshadowed by the intensity of the headlights of the approaching vehicle.
*387 Mr. Tonn was of the opinion that a combination of these factors, i. e. the lights on the approaching vehicle, the dark color of the truck stalled in the highway, as well as the other parked vehicles between the stalled truck and the approaching vehicle would tend to lengthen the perception time of the driver of the Volkswagen. Following the lapse of the perception time, according to this expert, would come the reaction time, and the evidence indicates that at the time that Mrs. Fanguy noticed the stalled truck, protruding into the highway, she was at too close a distance from it to avoid striking it.
Based upon the decisions in Dodge v. Bituminous Casualty Corporation, 214 La. 1031, 39 So.2d 720; Vowell v. Manufacturers Casualty Ins. Co., 229 La. 798, 86 So.2d 909; and Sittig v. Southern Farm Bureau Cas. Ins. Co., La.App., 198 So.2d 514, we feel that the Lower Court was correct, under the evidence produced, in exonerating Mrs. Fanguy from contributory negligence. Furthermore, it is basic law that the Courts of Appeal will not disturb or interfere with the finding of fact by the Lower Court unless it is shown that such finding of fact is manifestly erroneous. We find no error in the holding by the Lower Court to the effect that Mrs. Fan-guy was free of contributory negligence.
As regards the question of quantum, the record discloses that Dr. Carl Poche administered emergency treatment to the injuries of both Mrs. Fanguy and Miss Parish at the St. James Parish Hospital. He continued the treatment of Peggy Parish until her ultimate recovery, whereas Donna Sue Fanguy was treated subsequently by Dr. Gerald Haydel of Houma.
Dr. Poche said Miss Parish sustained a complete fracture of the medial malleolus (shin bone) which involves the ankle joint, together with a fracture of the left tenth rib posteriorly. In addition, she had a contusion of the forehead and sternum and swelling of both knees. A cast was applied to the right leg for a period of 7 weeks. The patient was discharged by Dr. Poche on May 20, 1968, some eleven weeks after the occurrence of the accident. Dr. Poche related that the chest injuries, particularly to the sternum, were quite painful. She was required to wear a rib belt for some three weeks and continued pain medications for an additional three week period. Miss Parish said her ankle still caused her occasional discomfort at the time of the trial. The Lower Court found that the injuries to Miss Parish were very painful, however, their duration was not long and there was no significant permanent disability to be expected. The Lower Court awarded her the sum of $6,000.00 for personal injuries.
In addition, Miss Parish was awarded special damages in the amount of $313.10 consisting of loss of work and medical and doctor bills.
Dr. Poche testified that he administered first aid treatment to Donna Sue Fanguy which consisted of a suture to a laceration which was just below her lower lip and a splint attached to her left arm which had a comminuted fracture. She was thereafter taken to Houma where she was treated by Dr. Gerald Haydel at the Terrebonne General Hospital.
When Dr. Haydel first saw Mrs. Fanguy, she was disoriented and he felt she had a brain concussion. She had a gross deformity of the left forearm as well as a deformity of the right lower extremity as well as multiple body contusions, abrasions and lacerations. He diagnosed her injuries as a very severe comminuted fracture of the left forearm, a fracture of the right leg and multiple contusions and abrasions. Dr. Haydel performed a close reduction of the right leg by the application of a case and splinted the patient’s forearm. She remained under observation for nine days. On March 11, 1968, she was admitted to surgery to the forearm and an intramedul-lary nail was inserted in the ulna and a plate and screws were inserted into the radius. She remained in the hospital for ten or eleven additional days for further observation after which her casts were changed, sutures removed and she was sent *388 home for further care on an outpatient basis. The cast on the leg was removed on April 19, 1968, the cast on her arm was not completely removed until August 30, 1968. The leg improved considerably before the arm and no future disability is suggested as a result of the injury to the leg.
By October 10, 1968, Dr. Haydel concluded that the bones in the patient’s arm had completely healed and there was no significant disability at that time.
In September of 1969, Mrs. Fanguy was examined by Dr. George Gernon Brown, Jr., an orthopedic surgeon in New Orleans, who was of the opinion that there was an uncertainty concerning whether the fractures of the forearm had healed. He felt that due to this and the appliances implanted in the arm, Mrs. Fanguy should expect further difficulty with her arm. He said supernation of the arm beyond the neutral could not be accomplished. At that time, he fixed a permanent disability of 25 to 33^4% of the arm. He only examined her on one occasion and was unable to state her condition at the time of his deposition without further examination.
Mrs. Fanguy also had two front teeth broken in the accident which required two permanent crowns. The accident left her with a noticeable, but minor, scar which, the Lower Court said did not detract from her appearance.
The record discloses that Mrs. Fanguy was discharged for return to work by Dr. Haydel on October 10, 1968, some 35 weeks after the accident. Because of the injuries to her arm, she was unable to resume her prior duties as personal secretary and went to work as a receptionist for Union Oil Company on October 10, 1968.
The Lower Court held that Mrs. Fanguy sustained serious injuries as a result of the accident and awarded her the sum of $15,-000.00 for her physical injuries. The Court also awarded her $6,329.09, a special damages of loss of wages, property damages and medical and doctor bills.
In Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149, the Louisiana Supreme Court held that the function of the reviewing Court is simply to determine whether the trial Court award is manifestly insufficient under all the circumstances of the case. The decision in Gaspard has been followed numerous times, and is the prevailing jurisprudence with regard to quantum.
In view of the painful and serious nature of the injuries to both Miss Parish and Mrs. Fanguy, we feel that the quantum allowed by the Lower Court was reasonable as regards both sides to this suit. Certainly the awards could not be considered as manifestly excessive or manifestly insufficient in view of the medical evidence adduced.
For the foregoing reasons, the judgment of the Lower Court will be affirmed, all costs of this appeal to be paid by defendants.
Judgment affirmed.